Judgment rendered May 3, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,970-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JONATHAN HOGG                               Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2019CR2936

Honorable Larry Donell Jefferson, Judge

* * * * *

RICHARD L. FEWELL, JR., APLC          Counsel for Appellant
By:  Richard L. Fewell, Jr.

LAW OFFICE OF RONALD K. COOK
By:  Ronald Keith Cook

JEFFREY M. LANDRY                     Counsel for Appellee
Attorney General

MADELEINE SLAUGHTER-YOUNG
MICHELLE ANDERSON THOMPSON
CHRISTOPHER N. WALTERS
Assistant Attorneys General

* * * * *

Before PITMAN, THOMPSON, and ROBINSON, JJ.

**ROBINSON, J.**

In July 2019, the defendant, Jonathan Hogg ("Hogg"), was indicted on charges of: (1) one count of second degree murder; (2) one count of attempted second degree murder; (3) one count of possession of a Schedule I drug with intent to distribute (marijuana); and (4) one count of possession of a Schedule II drug with intent to distribute (cocaine).

Following a jury trial, on May 25, 2021, Hogg was convicted by responsive verdict of: (1) one count of manslaughter in violation of La. R.S. 14:31; (2) one count of aggravated battery in violation of La. R.S. 14:34; (3) one count of possession of marijuana in violation of La. R.S. 40:966(C); and (4) one count of attempted possession with intent to distribute a controlled dangerous substance – Schedule II – (cocaine) in violation of La. R.S. 40:967(A).

Following the trial and verdict, Hogg filed a motion for judgment notwithstanding the verdict, a motion for full review by the court of grand jury testimony, and a motion for new trial. The trial court denied Hogg's motion for judgment notwithstanding the verdict. The trial court granted in-camera review of the subject grand jury testimony and ultimately ordered that a transcript of one of the witnesses' testimony be provided to defendant for purposes of *sentencing* only. Hogg's motion for a new trial was denied on the basis that the witness's grand jury testimony did not amount to undisclosed *Brady* material as to Hogg's *guilt*.

On October 7, 2021, Hogg was sentenced to: (1) 20 years at hard labor for manslaughter; (2) 5 years at hard labor for aggravated battery; (3) a fine of $150 for possession of marijuana; and (4) 5 years at hard

labor for attempted possession with intent to distribute cocaine; all sentences to run concurrently, with Hogg receiving credit for time served.

On November 2, 2021, Hogg filed a motion to reconsider sentence, claiming the sentence was excessive, which the trial court denied on February 7, 2022.

Hogg now appeals both the trial court's denial of the motion for judgment notwithstanding the verdict, as well as its denial of the motion to reconsider sentence.

We find the trial court properly denied Hogg's motion for judgment notwithstanding the verdict, motion for new trial, and motion to reconsider sentence. For the following reasons, Hogg's convictions and sentences are hereby affirmed.

**FACTUAL AND PROCEDURAL BACKGROUND**

On the evening of May 24, 2019, Hogg, along with Zachary Filhiol ("Filhiol") and Damian Haddox-Barragan ("Haddox-Barragan"), were at Hogg's residence in a Monroe neighborhood playing video games. According to statements made by Filhiol and Haddox-Barragan to the Ouachita Parish Sheriff's Office ("OPSO"), Jon Mark Miletello ("Miletello") sent a text message to Hogg about going to Hogg's home with a few friends; however, several additional, uninvited people accompanied the group. The entire group arrived at the Hogg home in the early morning hours of May 25, 2019, at approximately 3:00 a.m. Hogg, Filhiol, and Haddox-Barragan stated in police interviews that the group of guests were acting anxious and nervous, then suddenly attacked the three men and began fighting. There were allegations from both sides of the confrontation regarding who initiated the fight and for what reason, but evidence indicated

2

that drugs were involved and that Hogg was owed money by Miletello and Ashton McSwain ("Ashton") for Hogg's previous advance of drugs.

At some point during the fight, Filhiol drew a gun that Hogg later secured and discharged, striking the two victims, Miletello and D'Veil Freeman, Jr. ("Freeman"), as they were exiting the home. Hogg claims he fired in self-defense. Miletello succumbed to his injuries, and Freeman required emergency surgery. Hogg, Filhiol, and Haddox-Barragan all suffered bruises and abrasions from the attack, but no serious injuries requiring medical care. Neither Hogg, Filhiol, nor Haddox-Barragan called 911; rather, they immediately left Hogg's residence and went to Filhiol's home, approximately 15-20 minutes away. They sought advice from Filhiol's mother on how to handle the situation, who urged that they return to the scene. Hogg called his mother to instruct her to call 911 instead, and only called the sheriff's office as they were returning to the scene. They were arrested upon arrival. The group that had accompanied Miletello also did not call 911, but did bring Freeman to the hospital for medical treatment.

### Witness Statements and Trial Testimony

Hogg, Filhiol, and Haddox-Barragan were all interviewed by police shortly after the incident. Filhiol and Haddox-Barragan also testified at grand jury proceedings. Filhiol was the only one of the three to testify at trial.

Hogg provided his account of the shooting in his police interview shortly after the incident. He stated that six to seven people were with the group that came to the house. During the fight, Miletello was swinging at him and Aaron McSwain ("Aaron") was coming at him when he ended up in a headlock. Filhiol's backpack had fallen over at that time and a gun fell

3

out. Hogg also stated that someone with a mask and stick came in during the fight and that's when the gun was pulled. Some guys were trying to get the gun from Filhiol and it got knocked out of his hands, then Hogg grabbed it. Hogg said he made sure everyone saw the gun. After seeing the gun, everyone started running, except Miletello, who was still around Filhiol at the time. Hogg shot Miletello after that. He stated that he "shot low" only to scare them away.

Filhiol gave his account of the evening in his police interview, which was consistent with his trial testimony that provided additional details of the circumstances surrounding the shooting. Filhiol testified that "initially 7" people came to the house, and that only Hogg and Haddox-Barragan were jumped at first by a number of "at least 2 per person" while two other men stood over him and told him not to move. Filhiol further testified that neither he, Hogg, nor Haddox-Barragan did anything to provoke the fight. Filhiol stated that he soon lost sight of Haddox-Barragan once the fight started because Haddox-Barragan left the room. Filhiol then pulled his gun out of his backpack next to him and told the two men guarding him several times to run off, but was soon hit from behind by other men trying to wrestle the loaded gun away. He said a person with a mask and broomstick came in once the gun was brandished. During that struggle, the magazine fell out and he was pulled into the bedroom. He testified that at one point during the fight, there were four men attacking him. There were still people fighting him and someone was about to hit him with an office chair when he tried to shoot the gun, but it didn't go off. When he tried to get the firing pin back, he ejected the round in the chamber. He then lost the gun when he went to swing on someone, and it hit the door of the bedroom. After Filhiol threw

4

the gun, he saw Hogg in the corner of the rec room being choked by someone. He ran into the room and punched the man choking Hogg, then the man attacked him. He testified he "believed" he was hit with a pipe, but was not sure. Filhiol was fighting with that person for a short period of time in the rec room when Hogg got the gun. At the time Hogg started shooting, Filhiol had swung at the man who had just attacked him and the man was trying to tackle him, but started running when the shots were fired. People were still fighting right before the shots were fired, but they immediately ran off once the firing started. Everyone was running out the garage door when Miletello was shot.

Haddox-Barragan's police interview corroborated Filhiol's testimony. He stated that eight people total came to the house, including Miletello and someone he named as "Ashton," whose physical appearance he described, although he didn't know his last name. There were five men who originally came in, then another three later. He also mentioned a person walking in late with a mask and broomstick. During the fighting, he got pushed from the rec room into the bedroom and could not see what was happening. He also stated that he left the room where the fighting started and later heard gunshots, and was *told* by Filhiol and Hogg about the gun being knocked out of Filhiol's hand. Haddox-Barragan said he only knew that Hogg shot the gun because Hogg told him he did.

Other police interviews were conducted with Aaron, Ashton, Dakota Stewart ("Stewart"), and Frederick Britton ("Britton"). Freeman was interviewed at the hospital and later testified. Ashton Waffer ("Waffer") and Stewart took the stand at trial, but were uncooperative and ultimately did not testify as to the events.

5

According to the interviews and testimony, there were a total of seven people in the group that showed up at Hogg's home that night: Miletello, Freeman, Aaron, Ashton, Stewart, Britton, and Waffer. Waffer was not initially mentioned as present, but Freeman's family stated in a police interview that Freeman and Waffer had gone together to the bar that evening. Aaron also stated in his interview that Ashton left the scene with Freeman in a vehicle borrowed from Waffer, which was confirmed to be owned by Waffer's mother. Further, Freeman testified that Waffer was at the scene, but that he had stayed in the car, and that Waffer drove him to the hospital.

Aaron stated that Hogg had contacted them after the group left the bar that evening about money they owed, and Aaron told Hogg they had the money although they actually did not. They went to Hogg's house with the intention of sorting things out. When Aaron told Hogg they did not have the money, someone then hit him in his back and the fight broke out. When Aaron saw the gun, he told his friends they needed to leave and that they were walking out when they heard the shooting.

Stewart stated that they went to Hogg's house to buy weed and "there was tension in the air, and we punched them and they punched us." He said the gun was pulled out by someone, but not by who fired it. He stated that he saw Hogg with the gun and Miletello standing in front of him, but that he didn't see the actual shooting because they were all running out.

Ashton stated they went to Hogg's house to tell him he didn't have his money, and he brought friends with him because he didn't trust Hogg. He stated Hogg was upset, but that he wasn't sure how the fight started. He said

they tried to get the gun from the person who pulled it out, but once they couldn't get it from him, they started running, then the gunshots rang out.

Britton reiterated the statements that the group had gone to Hogg's house for his friends to talk to someone about money they owed. He stated that once the fight broke out, someone pulled a gun, so they took off running and heard gunshots.

Freeman testified about the incident. He stated that when they arrived at Hogg's, only Miletello, Ashton, Stewart, and Britton went inside, and that he initially stayed in the car. He went inside to check on them to see what was taking so long. When he walked in, he saw someone with a gun, so he tried to grab it and it dropped. He said he ran outside and when his foot hit the carport concrete, he was shot. He was unable to remember other details close in proximity to his shooting.

### Haddox-Barragan Grand Jury Testimony

Haddox-Barragan testified at the grand jury proceedings, but not at trial. The State did not provide any recording or transcript of Haddox-Barragan's grand jury testimony to the defense until after trial. This disclosure followed a motion filed by the defense and ultimately the trial court's order to disclose the testimony to the defense. The trial court found that the testimony was considered *Brady* material for sentencing purposes and that it should have been provided to the defense.

Haddox-Barragan's grand jury testimony was generally consistent with his police interview, but provided more detail about the events occurring the night of the incident. First, he initially testified that there were *ten* total persons that came to the Hogg home that evening with and including Miletello – three who were invited, seven that were not invited –

7

as opposed to his original statement that *eight* total guests came. However, later in his testimony, he refers to only *six* total visitors. Also, he expands upon what occurred when he left the room where the fighting originated. He explains that he got jumped while in the bedroom, then moved back toward the washroom. At that time, he could not see Hogg because Miletello was holding him down and had his hair wrapped up. He left the bedroom/washroom and went to the kitchen to get away from Miletello, who chased him. Haddox-Barragan was able to get a knife from the kitchen, then Miletello returned to the area where the others were still fighting. He saw Miletello run back through the washroom and into the bedroom. He waited briefly before reentering the area behind Miletello, then as he entered the bedroom, he saw Miletello enter the rec room. He stated that Miletello was between Hogg and the door between the rec room and the bedroom when Hogg started shooting. He testified that he did not see Miletello go *through* the rec room, and that "I couldn't see past the wall… I couldn't see him. I just saw him go into that room." Haddox-Barragan stated that Hogg was in the rec room when he started shooting and that everyone, including Miletello, started running when the gun went off. They didn't start running until he started shooting. In addition, Haddox-Barragan stated that the masked person that came in late was carrying a pipe, which he described as one of those "that go up and then it curves a little bit." He stated that Filhiol was hit by the masked person with the pipe, but that he was also hit by someone else with a stick at some point. In his police interview, he stated that the masked person had a broomstick, but did not mention a pipe.

Haddox-Barragan also mentions that Miletello walked into the "line of fire." However, this reference in his testimony is unclear. In response to

8

the prosecution's question regarding what happened with Miletello after Haddox-Barragan got the knife in the kitchen, he stated:

> Then he starts to leave and to the washroom and he could have, there's another door in the washroom that leads outside. And then he goes into the room and there's another door in the room that leads to outside. But you walk through the line of fire and there are still people in the house. And Jon started shooting and then they ran.

Later during the testimony, the prosecution attempts to clarify the "line of fire" reference.

> **AAG Slaughter-Young:** So you're saying, Jon, you're using the phrase 'he walked through the line of fire'?
>
> **Damian Haddox:** No. They he started running when the gun, uh, went off.

One of the grand jurors again attempted to clarify the reference, as follows:

> **Grand juror:** …I ask you to ask this again, just to be clear. He starts shooting, okay. And all six of the guys now are exiting out.
>
> **Damian Haddox:** …One door.
>
> **Grand juror:** …This one door to the garage.
>
> **Damian Haddox:** …M'hm.

## DISCUSSION

### *Brady – Motions and Trial Court Reasoning*

Following the conclusion of the trial, Hogg filed a "Motion and Memorandum for Full Review by the Court of Grand Jury Testimony Based on Testimony at Trial that there was Material Evidence Not Disclosed to Defendant," in which he claimed that Haddox-Barragan provided favorable testimony at the grand jury proceedings that the State failed to disclose to the defense, in violation of the due process requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963). In addition,

9

Hogg asserted in his motion that the discovery that Waffer was at the scene of the crime was material evidence for purposes of impeachment since the statements made by the group who came to the Hogg home were that Waffer was not present. Hogg also claimed that he believed immunity or the promise thereof was given to certain witnesses by the State, which was not disclosed. Hogg requested a hearing to determine whether the trial court should allow the in-camera inspection of grand jury testimony to determine whether any of the asserted undisclosed evidence would have been *Brady* material, such that the State would have been obligated to disclose the information to the defense.

Following a hearing on the motion, the trial court granted the in-camera inspection of the grand jury testimony to determine whether there was anything in the testimony that was required to be disclosed pursuant to the requirements of *Brady*. After the court's review, an additional hearing was held wherein the trial court ultimately authorized release of the recording and transcript of Haddox-Barragan's testimony to the defense, reasoning that "it does contain information along the lines that [the defense was] suggesting there in terms of what transpired, who was present, and who was the aggressor, not aggressor, etcetera."

After the Haddox-Barragan grand jury testimony was provided to the defense, a contradictory hearing was held to determine whether this testimony was considered *Brady* material, so as to warrant the granting of a new trial or some other relief. The court took the matter under advisement and later rendered a decision on the issue at the sentencing hearing.

The trial court found that the State violated La. C. Cr. P. art. 434.1(B), which dictates as follows:

The district attorney shall also disclose to the defendant material evidence favorable to the defendant that was presented to the grand jury.

It found the statute to be all-encompassing of the *Brady* requirements, noting that the "*shall … disclose*" [*emphasis added*] language meant that the State was required to disclose the favorable evidence regardless of whether the defense may already have the underlying substance of the evidence by other means. In this case, the State argued that Haddox-Barragan's police interview along with other evidence contained essentially the same information such that providing the grand jury testimony was unnecessary. The court stated that Haddox-Barragan's grand jury testimony added "more meat" to his police interview and gave a fuller perspective in terms of what transpired at the premises, when the court previously didn't have a clear picture as to the sequence of events during the fight. However, the court found that there was sufficient evidence for the jury to find Hogg guilty of the responsive verdict of manslaughter regardless of whether Haddox-Barragan's grand jury testimony was considered. Therefore, it held that based on the totality of the circumstances, a new trial was not warranted. Nevertheless, the court stated that it would take into consideration Haddox-Barragan's grand jury testimony in determining Hogg's sentence because "there are factors that are involved here that would mitigate toward a lesser sentence that -- than that would ordinarily be imposed in this case."

When discussing its sentencing considerations, the trial court stated that the *Brady* violation resulting from the State's failure to provide Haddox-Barragan's grand jury testimony pursuant to La. C. Cr. P. art. 434.1(B) would be considered as a sentencing factor, albeit not overriding or significant. It explained that Hogg's manslaughter sentence would

11

ordinarily have been 25 years, but that it was reduced to 20 years at hard labor due to the *Brady* violation.

Hogg filed a motion to reconsider sentence based on excessiveness considering the circumstances, including Hogg's age, as well as the *Brady* violation. He reiterated that since self-defense was the primary defense, without Haddox-Barragan's grand jury testimony, the jury was deprived of hearing evidence further supporting that the Hogg group were all victims. In response, the State first notes that not only did Hogg not make any argument regarding the *Brady* violation in his motion to reconsider, therefore waiving the argument, but that the argument had already been more than adequately addressed and disposed of in prior proceedings. In addition, the State refers to the court's thorough detailing of the sentencing factors, what weighed in favor, what weighed against, and the reasons for sentencing. It states that, "We believe those reasons were imminently [*sic*] reasonable and supported by the record." The trial court denied Hogg's motion to reconsider, stating that it had considered all relevant mitigating factors, including Hogg's age and Haddox-Barragan's grand jury testimony, noting that Hogg only received a sentence of 20 years when the maximum sentence for the manslaughter conviction is 40 years.

Hogg argues that the trial court erred in refusing to grant his motion for judgment notwithstanding the verdict or motion for a new trial because the State violated the requirements of La. C. Cr. P. art. 434.1(B) and *Brady* by knowingly and purposely failing to disclose Haddox-Barragan's grand jury testimony to the defense because the evidence was material and exculpatory and should have been provided to the defense prior to trial. He argues that had the defense been provided with this testimony, there is more

than a reasonable probability that the jury verdict would have been different, likely resulting in acquittals.

Hogg notes that the State disclosed the grand jury testimony of Filhiol prior to trial because it was material evidence favorable to Hogg, and as a result, he was called as a witness by the defense. Hogg argues that Haddox-Barragan's testimony corroborated Filhiol's testimony and provided additional relevant, material, and significant evidence, including favorable, exculpatory evidence. He claims that Haddox-Barragan further described the initial attack by the assailants, including the beating taken by Filhiol, Miletello's specific involvement, and Hogg firing the weapon through an open door and the assailants then running through the line of fire.

### Brady Analysis – State v. Brown

The recently decided Louisiana Supreme Court case of *State v. Brown*, 16-0998 (La. 1/28/22), 347 So. 3d 745, is factually similar to this case and speaks clearly to the *Brady* issue. In *Brown*, the defendant, an inmate who was charged with first degree murder of a prison guard in a concerted escape attempt, asserted several months after his trial and conviction that the state revealed that it was in possession of a previously undisclosed interview with another inmate to whom a codefendant confessed, implicating himself and another codefendant, but not the defendant, in the murder. The defendant argued that the statement would have provided compelling evidence supporting his statement that he left the guard injured but alive, and that he was uninvolved with and did not share the intent of the men who beat the guard to death. The defendant maintained that the failure to disclose this evidence until after he had been convicted of first degree murder and sentenced to death violated his due process rights

13

under *Brady*. He argued that the suppressed confession scarcely mentioned him and was consistent with his statement to law enforcement that he did not share the intent of the prison guard's killers.

Like this case, the *Brady* issue in *Brown* came before the court via a motion for new trial. *Id*. The defendant contended that the codefendant's statement constituted *Brady* material that the state was required to provide to defendant in advance of trial. *Id*. Ultimately, the trial court found that defendant was not entitled to a full new trial because the evidence "at the guilt phase of the trial was overwhelming," such that the codefendant's statement was not material, finding that the defendant's actions "certainly constituted an intent to, at least, inflict great bodily harm on the victim." *Id*. However, the trial court did determine that the defendant was entitled to a new penalty-phase-only trial, concluding that "there is a reasonable probability that the jury's verdict would have been different had the evidence not been suppressed and further that because of this and, probably more that the Court is not stating, the Court does not have confidence in the jury's verdict as to the death penalty." *Id*.

The State in *Brown* applied for writs from the ruling granting the new penalty phase trial and the First Circuit reversed, finding that the defendant had only satisfied two of the three components of a constitutional violation under *Brady* and had not shown there was a reasonable probability that his sentence would have been different had the statement been disclosed. *Id*. From the court of appeal's ruling, the defendant applied for writs to the Louisiana Supreme Court. *Id*. The writs were denied, finding that the State's failure to disclose the statement did not constitute a true *Brady* violation because (1) the statement was not favorable, and (2) the failure to

14

disclose the statement was not prejudicial to him (i.e., the statement was not "material" for *Brady* purposes).  *Id.*  The Supreme Court subsequently decided to further examine the defendant's arguments on direct appeal regarding the new trial motion because the writ denial had no precedential value and it then had the benefit of a full record and additional arguments advanced on appeal.  *Id.*

*Brown* provided a lengthy discussion regarding *Brady* and its progeny, as follows:

> In *Brady*, the Supreme Court held that suppression by the prosecution of evidence favorable to the accused violates a defendant's due process rights where it is material either to guilt or punishment, without regard to the good or bad faith of the prosecution.  *Brady*, 373 U.S. at 87, 83 S. Ct. 1194.  This rule encompasses evidence which could be used to impeach a witness whose reliability or credibility may determine the defendant's guilt or innocence.  *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *State v. Knapper*, 579 So. 2d 956, 959 (La. 1991).  Furthermore, it extends to both late disclosure and/or non-disclosure of favorable evidence that significantly impacts the defendant's opportunity to effectively present the evidence or compromises the trial's fundamental fairness.  *State v. Kemp*, 00-2228, p. 7 (La. 10/15/02), 828 So. 2d 540, 545.
>
> Nevertheless, as this court has recognized, "not every violation of the broad duty of disclosure constitutes a *Brady* violation."  *Brown*, 15-2001 at 2, 184 So. 3d at 1266.  In fact, *Brady* and its progeny do not establish a general rule of discoverability:  the prosecutor does not breach the constitutional duty to disclose favorable evidence "unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."  *United States v. Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342; *State v. Bright*, 02-2793, 02-2796, p. 6 (La. 5/25/04), 875 So. 2d 37, 42.
>
> In *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the Supreme Court laid out the three components of a true *Brady* violation:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and

15

prejudice must have ensued." *Strickler*, 527 U.S. at 281-282, 119 S. Ct. 1936.

Relative to the materiality component of a *Brady* violation, a reviewing court must ascertain not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in the absence of the undisclosed evidence the defendant received a fair trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). *See also*, *State v. Strickland*, 94-0025, p. 38 (La. 11/1/96), 683 So. 2d 218, 234.

A *Brady* violation occurs when the "evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434, 115 S. Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S. Ct. 3375). Further, while late disclosure or non-disclosure of exculpatory evidence may deprive the defendant of a fair trial, in both instances the impact on the defense "must be evaluated in the context of the entire record." *Kemp*, 00-2228 at 7, 828 So. 2d at 545.

*Id*. at pp. 129-130, 347 So. 3d at 834-5.

The Louisiana Supreme Court examined the statement that was made by the codefendant in light of the defendant's argument that the statement provided compelling evidence that supported his own statement that he left the defendant injured but alive, and was uninvolved in and did not share the intent of the men who killed the guard. *Brown*, *supra*. The Court found that the statement simply did not exculpate the defendant and in that regard was not favorable to him. *Id*. It explained that while the statement inculpated the codefendants as the ones who *decided* to kill the guard, it provided no additional information as to who actually *killed* him. *Id*. Other than to implicate the defendant as one of the participants, the statement contains little to no elucidation of the defendant's role; therefore, the statement was not *favorable* to defendant. *Id*.

With respect to *materiality*, the Supreme Court noted that the trial court determined that the evidence at the guilt phase of trial was

16

"overwhelming," and that the co-defendant's statement was not material to the jury's determination of guilt. In order to prove first-degree murder, the State only had to prove the defendant was a principal in the crime and, at minimum, had the specific intent to inflict great bodily harm. Given the foregoing abundant evidence linking defendant to the murder, the Supreme Court agreed with the trial court's assessment and found it was highly improbable that the co-defendant's statement would have altered the outcome of the guilt phase, as the defendant's actions "certainly constituted an intent to, at least inflict great bodily harm [on the victim]."

As to the jury's decision to impose the death penalty, the Supreme Court also found that the suppressed statement was not material. The evidence was not material to the statutory mitigator suggested, that defendant's participation in the crime was "relatively minor," and that, as a result, he bears a lesser degree of moral culpability for the victim's death. The Supreme Court found that the trial court's decision to grant the defendant a new penalty phase trial was an abuse of the court's broad discretion in light of its evaluation of the withheld statement, which is neither favorable nor material to defendant, in the context of the full record.

***Brady – Suppression of Evidence; LA C. Cr. P. Art. 443.1(B)***

To establish a *Brady* violation, the defendant must prove that (1) the prosecution *suppressed* evidence; (2) the evidence was *favorable* to the defendant; and (3) the evidence was *material.* Where a defendant fails to establish any one element of *Brady,* we need not inquire into the other components. *See United States v. Runyan,* 290 F. 3d 223, 245 (5th Cir. 2002); *United States v. Hughes,* 230 F. 3d 815, 819 (5th Cir. 2000).

17

Whether the State suppressed evidence depends on whether it had the obligation to disclose the evidence, in this case, Haddox-Barragan's grand jury testimony. In an effort to balance the competing interests of *Brady* and the secrecy of grand jury proceedings, the Louisiana Supreme Court in *State v. Trosclair*, 443 So. 2d 1098 (La. 1983), created a limited exception to grand jury secrecy, holding that the indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity. *Id.*; *see also State v. Taylor*, 18-0192 (La. App. 4 Cir. 5/23/18), 247 So. 3d 1192, *writ denied*, 18-0192 (La. 11/20/18), 256 So. 3d 989, and *State v. Francis*, 18-1395 (La. 9/21/18), 252 So. 3d 875. The party seeking disclosure of grand jury testimony bears the burden to show a compelling necessity for breaking the indispensable secrecy of grand jury proceedings, and must demonstrate a particularized need that outweighs the need for continued secrecy. *Trosclair*, *supra*. The defendant must show that, without the material, his case would be greatly prejudiced or that an injustice would be done. *Id*.

In 2012, the legislature enacted La. C. Cr. P. art. 434.1(B), which sets forth the only statutory exception to grand jury secrecy that specifically allows for the disclosure of grand jury testimony to a defendant by directing a district attorney to "disclose to the defendant material evidence favorable to the defendant that was presented to the grand jury." Thus, the courts have limited authority to allow for the disclosure of grand jury testimony to a defendant. *Taylor*, *supra*.

In-camera inspection by the trial judge is a proper means of accommodating the secrecy of the grand jury while protecting a defendant's constitutional rights of confrontation and due process. *Taylor*, *citing State v.*

*Peters*, 406 So. 2d 189 (La. 1981). A trial court may act upon a specific request stated with particularity and review grand jury transcripts in camera to determine if information contained therein is favorable to the accused and material to guilt or punishment. *Francis*, *supra*, *citing State v. Higgins*, 2003-1980 (La. 4/1/05), 898 So. 2d 1219. If disclosure is permitted, it must be closely confined to the limited portion of the material for which there is particularized need. *Francis*, *supra*, *citing Trosclair*, *supra*. In any event, disclosure is left to the sound discretion of the trial court whose ruling will not be reversed absent an abuse of that discretion. *Francis*, *supra*, *citing Higgins*, *supra*.

In *Taylor*, *supra*, the district court ordered the State to provide it with a copy of the grand jury transcript for an in-camera review in order for it to fully consider the defendant's motions to quash, which included several arguments such as prosecutorial misconduct, improper grand jury instructions, and an inconsistency in the victim's statement. Following review, the court ordered the State to disclose the full grand jury transcript to the defendant, ruling that the defendant's need for the transcripts outweighed the interest in grand jury secrecy. *Id*. The Fourth Circuit granted the State's writ and found that a review of the record and the sealed grand jury transcript revealed that the transcript did not include any "material evidence favorable" to the defendant pursuant to La. C. Cr. P. art. 434.1(B). It held that, "Because 434.1(B) evidence is the **only** evidence the legislature has authorized for the breaking of the indispensable secrecy of grand jury proceedings and this grand jury transcript does not include any Article 434.1(B) evidence, the district court's decision to disclose the transcript was either based an [*sic*] erroneous application of the law or a clearly erroneous

19

assessment of the sealed grand jury transcript itself." *Id.* at p. 7, 247 So. 3d at 1196-7.

In *Francis*, *supra*, the district court granted in-camera review of grand jury testimony, then ordered that the State furnish full transcripts of the grand jury testimony of the cooperating former codefendants, because it found that their testimony contained material that could be used to impeach these witnesses if they testified at trial. The Louisiana Supreme Court granted the State's writ and held that the district court abused its discretion in ordering disclosure of the grand jury testimony, holding that, while the evidence may be useful in impeaching witnesses if the State calls them to testify at trial, it is not material evidence favorable to the defendant, as required to justify breaking grand jury secrecy in accordance with the jurisprudence, *Trosclair* and *Higgins*, and La. C. Cr. P. art. 434.1(B). *Id.*

Here, the trial court ordered an in-camera review of all the grand jury testimony based on Hogg's assertion that the State suppressed evidence favorable to him which, had it been offered at trial, would have likely resulted in a different verdict. Following its review, the court authorized release of the recording and transcript of Haddox-Barragan's testimony to the defense, opining that the testimony contained more details than the police interview about what transpired during the incident. In addition, it found that the State had violated La. C. Cr. P. art. 434.1(B) – thereby suppressing the subject evidence – reasoning that the statute's language of "*shall … disclose*" [*emphasis added*] meant that the State was required to disclose the favorable evidence regardless of whether any other evidence in the record contained the same information.

We find the trial court's interpretation of La. C. Cr. P. 434.1(B) to be flawed. The State's obligation to disclose Haddox-Barragan's grand jury testimony pursuant to La. C. Cr. P. art. 434.1(B) hinges on whether that evidence is material as to guilt or punishment *and* is favorable to the defendant, consistent with other *Brady* determinations. It is true that the district attorney is required to disclose certain exculpatory evidence from grand jury proceedings to a defendant, but such mandatory disclosure is solely for evidence that is both favorable to the defendant and material – a *Brady* determination. Further, whether the evidence is material is to be determined in light of the entirety of the record. Therefore, the fact that there was a wealth of other evidence as to Hogg's guilt, including Haddox-Barragan's police interview, greatly impacts the determination of materiality, and resultingly, the State's obligation to disclose the evidence.

In addition to the State's obligations to disclose as imposed by *Brady*, this Court takes into account that Hogg never attempted at any point before or during trial to obtain a recording or transcript of the testimony. Prior to trial, Hogg was provided with Haddox-Barragan's recorded police interview, which was conducted only a few hours after the incident. He was also aware that Haddox-Barragan testified during the grand jury proceedings because the defense actually offered him as a witness and consulted with him immediately prior to the proceedings.

### *Brady – Favorable Evidence*

Haddox-Barragan's grand jury testimony was mostly consistent with his police interview statements, but it provided more detail. He testified at length about his own involvement in the fight, including his altercation with Miletello in which he was chased into the kitchen and had to arm himself

21

with a knife, but the account of his actions that did not involve Hogg is nothing short of a red herring as to Hogg's culpability. Haddox-Barragan testified multiple times that he could not see Hogg during most of the fight because he was almost immediately pushed out of the room where Hogg was located when the fight started, then was being held down with his hair wrapped up where he could not see, and because he had exited the area to go into the kitchen while he was fighting Miletello. He also testified that, although he saw Miletello enter the rec room shortly before Hogg fired the shots, he was unable to see him once he was inside the room. Further, nothing in the testimony conflicted with his police interview statement that he only knew that Hogg had shot the gun because Hogg had told him he had. Haddox-Barragan's elaboration of his own altercation may have helped the trier of fact in following a sequence of events, but it was not necessarily favorable to Hogg.

The defense strongly argues Haddox-Barragan's reference to Miletello walking into the "line of fire," but as discussed hereinabove, this unclear statement was clarified by the State and the grand jury to confirm that Haddox-Barragan meant only that the visitors did not start running away until the shots were fired. The assertion that the attack by the visitors did not cease until Hogg fired shots is favorable to the defendant, but it is consistent with other witness testimony and statements.

One of the discrepancies in the interview and testimony included how many visitors came to the Hogg house. In Haddox-Barragan's police interview, he stated that eight men total came, but initially testified that there were *ten* total persons that came. However, later in his testimony, he refers to only *six* total visitors. Also, statements and testimony from other

22

witnesses, as well as other evidence, were consistent with the number of visitors being approximately six or seven. The fact that the Hogg group was outnumbered is favorable to Hogg's defense, but is also consistent with other witness testimony and statements. If the testimony that the group of visitors was larger, that would be more favorable; but, on the other hand, the inconsistencies of Haddox-Barragan's statements could be detrimental.

In addition, Haddox-Barragan stated that the masked person who came in late was carrying a pipe, which he described as one of those "that go up and then it curves a little bit." He stated that Filhiol was hit by the masked person with the pipe, but that he was also hit by someone else with a stick at some point. In his police interview, he stated that the masked person had a broomstick, but did not mention a pipe. This portion of the testimony – the fact that the weapon was more dangerous than previously indicated – would be favorable to Hogg, as well as the reiteration that weapons were used.

Some of Haddox-Barragan's testimony would also be considered incriminating to Hogg, such as placing Miletello in the room with Hogg and reiterating that the visitors started running as soon as the gun went off, seemingly weakening Hogg's self-defense theory. Nonetheless, the fact that there may be inculpatory evidence along with favorable, exculpatory evidence, does not in and of itself defeat an argument that a *Brady* violation may have occurred.

### *Brady – Material Evidence*

The determination of whether evidence is considered *material* for purposes of a *Brady* violation depends on whether, in the absence of the undisclosed evidence, the defendant received a fair trial resulting in a verdict

worthy of confidence. *Kyles*, *supra*; *Strickland*, *supra.* A *Brady* violation occurs when the "evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, *supra*, *quoting Bagley*, *supra.* Further, while late disclosure or nondisclosure of exculpatory evidence may deprive the defendant of a fair trial, in both instances the impact on the defense "must be evaluated in the context of the entire record." *Kemp*, *supra.*

The State presents the argument that the determination of materiality applied only to the portions of Haddox-Barragan's grand jury testimony that were additional to or different from his police interview statements. This interpretation is slightly skewed. Instead, this Court reviews Haddox-Barragan's testimony as a *whole*, including not only the portions of the testimony that were additional or different than the police statements, but also those portions of the testimony that were consistent with the police statement that may serve to bolster any arguments of the defense. In any event, the result is the same.

Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Brown*, *supra*; *Bagley*, *supra.* "A 'reasonable probability' exists when the government's suppression of evidence 'undermines confidence in the outcome of the trial.'" *Brown*, 16-0998 at p. 130, 347 So. 3d at 834. However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome at trial, does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. 97, 109, 96 S. Ct. 2392, 49 L. Ed. 2d 342. "To prove a reasonable probability of a different result, the 'likelihood of a different result must be substantial, not just conceivable.'" *State v.*

*Jackson*, 16-1100 (La. 5/1/18), 248 So. 3d 1279 at 1283, citing *Harrington v. Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 792 (2011).

The bulk of Haddox-Barragan's testimony was consistent not only with his own statements to police, but with several other witness statements, including Hogg and Filhiol, who actually witnessed what transpired immediately leading up to the shooting. There were police interviews with Hogg, Filhiol, Haddox-Barragan, Aaron, Ashton, Stewart, Britton, and Freeman. Filhiol and Freeman also testified at trial. Numerous officers involved in the investigation testified. Physical evidence was introduced regarding the weapon used in the shooting and to support that the victims were shot in the back from a certain distance as they fled. Evaluated in the context of the entire record, the impact on the defense of the nondisclosure of Haddox-Barragan's grand jury testimony was minimal, at best.

Although the additional or different information provided in the testimony – such as the description of the pipe and how many visitors came to the house – was relevant to Hogg's self-defense theory, the availability of this information prior to trial did not create a reasonable probability or substantial likelihood of a different result as to Hogg's guilt, especially given that the jury had already taken into account a significant amount of other evidence that was consistent with the testimony before entering a responsive verdict.

*Brady* information includes favorable evidence that is material *either to guilt or punishment*. As to Hogg's *punishment*, the trial court determined that the testimony was considered *Brady* material for purposes of the punishment phase only and ultimately used the State's nondisclosure of the evidence as a mitigating factor for sentencing.

However, the trial court did not elaborate on the factual basis associated with its determination that the *Brady* violation was a mitigating factor. It found that the *Brady* violation in and of itself, that is, the State's suppression of evidence in violation of La. C. Cr. P. art. 434.1(B), was a mitigating factor. The court stated during sentencing that "[it] factor[ed] in the *Brady* issue and that causes some reduction in what I was going to hand out here," and "the fact that they did not give that material was another justification of my not giving him more years than he had actually gotten."

Materiality still has to be proven as to the punishment phase and sentencing considerations. In this case, some of the possible relevant mitigating factors under La. C. Cr. P. 894.1B would include:

> (24) The defendant acted under strong provocation.
> (25) There were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense.
> (26) The victim of the defendant's criminal conduct induced or facilitated its commission.

As mentioned previously herein, Haddox-Barragan's testimony differed from his police statement mostly in regards to the enhanced description of his own altercation, which did not occur within the vicinity of Hogg immediately prior to the shooting, so to provide insight as to Hogg's self-defense theory. The only two issues in his testimony that would be relevant to any of the factors would be his reference to allegedly more visitors than he had indicated in his police statement, and the description of the pipe that the masked person had carried. The testimony did paint a clearer picture as to how the evening's events transpired, but not in any way that was either favorable to Hogg or that would impact any of the mitigating factors so as to affect sentencing. In fact, the trial court even refers to the inculpatory

26

evidence included in Haddox-Barragan's testimony, the fact that his testimony reinforced the story that the group of visitors was running away.

The trial court first erred in ordering the State to disclose the Haddox-Barragan testimony to Hogg because it failed to conduct a proper *Brady* analysis in conjunction with its in-camera review of the grand jury testimony. Instead, it authorized the disclosure based simply on the reasoning that Haddox-Barragan's grand jury testimony provided more details than his police interview. This fails to overcome the threshold standard as set out in *Trosclair* that the defendant must show a *compelling necessity* to justify the breach of grand jury secrecy, or the requirements to prove a *Brady* violation – that the prosecution suppressed favorable evidence that is material to the defendant's guilt or punishment. The *Brady* analysis was not conducted until *after* the evidence was disclosed, but was, nevertheless, flawed.

When the trial court did conduct its untimely *Brady* analysis, it erred in finding that the Haddox-Barragan testimony was considered *Brady* material for purposes of the sentencing phase. The court found that the omitted evidence was not material for determination of guilt, but allowed the evidence to be considered in sentencing without considering materiality as to punishment, i.e., the mitigating factors. Even if the court had conducted the proper analysis for the punishment phase, we find that the additional evidence from Haddox-Barragan's grand jury testimony barely pertained to Hogg's guilt, much less undermined the confidence in finding certain mitigating factors that did not already exist given the entirety of the record.

The trial court sentenced Hogg to 20 years for the manslaughter conviction, admittedly five years less than what the sentence had normally

been had there been no *Brady* violation. However, because the sentence is within the allowable range for the charge, we find the court's error to be harmless. In addition, the State acquiesced in the court's lowered sentence, stating it considered all the sentencing factors to be reasonable.

*Excessive Sentence*

Hogg claims that the trial court did not consider any applicable mitigating factors in arriving at the appropriate sentence, in violation of La. C. Cr. P. art. 894.1. He also claims that, although the sentence is within the allowed range and not the maximum, it is, nevertheless, constitutionally excessive given the circumstances of the case. He argues at length that more weight should be given to the significant amount of evidence that was produced at trial indicating that he, only 17 years old at the time of the incident, was acting in self-defense and/or defense of others when multiple individuals came into his home uninvited and initiated a fight with weapons. He emphasized that despite a firearm being brandished by Filhiol, the attack continued and only ceased when Hogg fired the handgun.

There is a two-prong test to be used by the appellate court when reviewing an excessive sentence claim: (1) the trial record must demonstrate that the trial court complied with the guidelines in La. C. Cr. P. art. 894.1 (list of sentencing factors); and (2) the appellate court must determine if the sentence is constitutionally excessive. *State v. Ladd*, 14-1611 (La. 3/27/15), 164 So. 3d 184 (*per curiam*).

Articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. *State v. Duncan*, 53,194 (La. App. 2 Cir. 1/15/20), 290 So. 3d 251. Where the record clearly shows an adequate factual basis for the sentence imposed,

28

remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 5/1/17), 219 So. 3d 332. Important elements to be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and likelihood of rehabilitation. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. DeBerry*, *supra*. There is no requirement that specific matters be given particular weight at sentencing. *State v. DeBerry*, *supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 07-0144 (La. 9/28/07), 964 So. 2d 351.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980); *State v. Jackson*, 51,575 (La. App. 2 Cir. 9/27/17), 244 So. 3d 764. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. DeBerry*, *supra*; *State v. Modisette*, 50,846 (La. App. 2 Cir. 9/28/16), 207 So. 3d 1108.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Allen*, 50,869 (La.

App. 2 Cir. 9/28/16), 206 So. 3d 1093, *writ denied*, 16-2046 (La. 9/15/17), 225 So. 3d 484.

In its original ruling and sentencing, the trial court explained its reasoning as it applied to the facts of the case, and specifically discussed the aggravating and mitigating factors for sentencing. Although it did not make specific statutory references when elaborating on the sentencing factors, it did provide detailed reasoning for sentencing as supported by La. C. Cr. P. 894.1(B). It noted several aggravating circumstances including, but not limited to, Hogg's need for correctional treatment, no showing of intent to stop criminal activity, the use of a dangerous weapon in committing the offense, involvement of controlled dangerous substances, and the victim's family's loss of a child. It also found certain mitigating circumstances, including Hogg's young age and the provocation by the victims.

The sentencing range for manslaughter is 10 – 40 years. The trial court's concurrent sentences of 20 years total on the manslaughter, aggravated battery, and attempted possession with intent to distribute cocaine convictions, are within the allowed sentencing ranges and well within the limits of appropriate sentences for similar crimes that have been deemed constitutionally proper by this Court. In fact, given the trial court's error in finding a *Brady* violation in Hogg's penalty phase, this Court believes a harsher sentence would have been more appropriate. However, the current sentence is within the allowed range and not illegally lenient.

Hogg's sentence is not constitutionally excessive and is well-supported by the record. The trial court adequately considered the facts of the case presented at trial and the seriousness of the offense, as well as both aggravating and mitigating factors. There was no abuse of discretion in

30

imposing a 20-year sentence for Hogg's conviction of manslaughter, which is less than the maximum allowed sentence.

***Errors Patent***

First, a review of the record indicates that Hogg was never arraigned. La. C. Cr. P. art. 555 provides that "[a] failure to arraign the defendant … is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty."  Hogg did not object, the defense was waived, and a plea of not guilty was entered by default.

Second, the trial court did not state that the sentence of 20 years at hard labor for the manslaughter count was without benefits, though La. R.S. 14:31 mandates that time served is without benefits.  This omission in sentencing is considered harmless error since the sentence would default to the terms of the statute.

## CONCLUSION

For the foregoing reasons, we uphold the trial court's denial of Hogg's motion for judgment notwithstanding the verdict, motion for new trial, and motion to reconsider sentence.  The convictions and sentences are hereby affirmed.

**AFFIRMED.**